UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRAVELEX CURRENCY SERVICES, INC.,

        Plaintiff,

- against -

PUENTE ENTERPRISES, INC.,

        Defendant.

---

PUENTE ENTERPRISES, INC.,

        Counterclaimant,

- against -

TRAVELEX CURRENCY SERVICES, INC.,

        Counter-Defendant.

---

PUENTE ENTERPRISES, INC.,

        Third-Party Plaintiff,

- against -

JAMES C. HEWITT, JR.,

        Third-Party Defendant.

**OPINION AND ORDER**

18 Civ. 1736 (ER)

Ramos, D.J.:

Travelex Currency Services is a retail foreign-currency-exchange company. For years, Travelex subcontracted with Puente Enterprises, Inc. ("PEI")—an airport-concessions operator—to offer consumers Travelex products and services at various locations in the Dallas/Fort Worth International Airport ("DFW Airport") and the George Bush Intercontinental Airport ("IAH Airport"). Travelex and PEI's business relationship deteriorated in 2016, however, when a dispute arose over ownership rights in monies contained in a certain operating bank account. Eventually, Travelex terminated its business relationship with PEI and brought the instant action, which accuses PEI of breach of contract and conversion. Doc. 9.

In answering Travelex's complaint, PEI denied liability and asserted counterclaims against Travelex for breach of contract, fraud, and tortious interference. Moreover, PEI brought a third-party complaint against James C. Hewitt, Jr.—Travelex's Chief Executive Officer—asserting a claim for defamation against both Hewitt and Travelex. Doc. 12.

Travelex and Hewitt now move to dismiss PEI's counterclaims for fraud, tortious interference, and defamation. Doc. 27. For the reasons set forth below, their motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

In deciding Travelex and Hewitt's motion to dismiss PEI's counterclaims, the Court construes PEI's answer and counterclaims in the light most favorable to PEI, the nonmovant, and accepts all well-pleaded facts therein as true. *See Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liber.*, 23 F. Supp. 2d 439, 445 (S.D.N.Y. 1998) (citing *Hirsch v. Arthur Anderson & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995)).

A.  **Factual Background**

In July 2005, Travelex successfully bid to provide currency services at DFW Airport. Around that same time, Travelex subcontracted with PEI—a certified Airport Concession Disadvantaged Business Enterprise ("ACDBE")[1]—to provide currency services on Travelex's behalf at DFW Airport. Doc. 12 ¶ 24. In support of its Travelex-related operations, PEI used a bank account it had already maintained at Frost National Bank (the "Frost Account"). *Id.* ¶ 25.

In August 2008, Travelex subcontracted with PEI to operate four additional Travelex locations at DFW Airport. *Id.* ¶ 26. In light of their expanded relationship, Travelex and PEI entered into a new operating agreement (the "DFW Agreement"), dated January 1, 2009, which governed their rights and obligations regarding their business relationship at DFW Airport. *Id.* ¶ 28. Among other requirements, the Agreement required PEI to maintain an operating account at OmniAmerican Bank, which was to be jointly owned and accessible by PEI and Travelex. Doc. 29-2 at 5–6.

Notwithstanding the DFW Agreement, neither PEI nor Travelex took any steps to establish a joint account at OmniAmerican Bank—or any other bank, for that matter. Doc. 12 ¶ 31. Instead, PEI continued to use the Frost Account for Travelex-related operations and granted Travelex the right to review the Frost Account's balance and transaction activity. *Id.*

---

[1] The definition of an ACDBE is provided in 49 C.F.R. § 23.3 (2019):

> Airport Concession Disadvantaged Business Enterprise (ACDBE) means a concession that is a for-profit small business concern—
>
> (1) That is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and
> (2) Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it.

In February 2010, in further expansion of the parties' relationship, Travelex subcontracted with PEI to operate certain Travelex retail locations at the IAH Airport in Houston, Texas (the "IAH Agreement"). *Id.* ¶ 38.

In December 2013, following years of successful operations by PEI of Travelex retail locations at the two airports, Travelex applied to renew its contracts with DFW Airport. *Id.* ¶ 39. According to PEI, DFW Airport required each contract proposal to involve an ACDBE, and PEI was one of only two ACDBEs in the country that could satisfy DFW Airport's other contractual requirements. *Id.* ¶ 44. Hence, securing PEI's cooperation was critical to Travelex's proposal.

Prior to submitting the proposal to DFW Airport, Travelex assured PEI that it would increase PEI's "Concession Fee"[2] from 30 percent to, at minimum, 35 percent. *Id.* ¶¶ 40–41. In line with this assurance, in its proposal to DFW Airport Travelex represented that PEI would continue to serve as Travelex's ACDBE subcontractor and would retain more than 35 percent of the Concession Fees generated from Travelex-related operations at DFW Airport. *Id.* ¶ 43.

DFW Airport accepted Travelex's proposal in February 2014. *Id.* ¶ 46. Nine months later, in November 2014, DFW Airport and Travelex entered into new agreements covering all Travelex locations operated by PEI in DFW Airport. *Id.* Around this same time, DFW Airport requested that Travelex and PEI enter into a new agreement that would supersede the DFW Agreement to reflect, among other things, the new compensation structure Travelex promised to PEI. *Id.* ¶ 47.

---

[2] While the parties do not define the term "Concession Fee" in their pleadings or moving papers, the DFW Agreement makes clear that "Concession Fee" refers to "the percentage of Gross Revenue" payable to each party, and "Gross Revenue" is in turn defined as "the gross profit arising from the operations at the Facilities in the Airport." Doc. 29-2. According to the DFW Agreement, the Concession Fee payable to Travelex was 70 percent of Gross Revenue. PEI was entitled to the remaining 30 percent.

4

In response to this request, Travelex and PEI began to negotiate a new agreement. *Id.* ¶ 48. While the parties negotiated, Travelex continued to pay PEI 30 percent of the Concession Fees, not the 35 percent promised. *Id.* ¶ 50. Moreover, during negotiations, Travelex suggested changes to then-existing cash and deposit procedures that were, in PEI's view, onerous and unacceptable. *Id.* ¶¶ 50–55.

Negotiations came to a head once Travelex—for the first time—claimed ownership of the balance of monies in the Frost Account. *Id.* ¶ 55. PEI disputed Travelex's ownership, and, in response, Travelex advised PEI that it would reconcile the Frost Account and that thereafter the parties would open and use a new joint operating account going forward. *Id.* ¶¶ 56–57. Reconciliation of the Account commenced in December 2014 and ended in April 2016. *Id.* ¶ 59.

On April 15, 2016, Travelex promised that, as part of any new agreement with PEI, it would release and waive all claims to monies in the Frost Account. *Id.* ¶ 66. However, Travelex inexplicably reversed positions a few days later and began claiming ownership of the balance in the Frost Account *and* of the cash in PEI's possession at the Travelex locations in the DFW Airport. *Id.* ¶¶ 68–69.

The rift between the parties deepened in May 2016 when Travelex attempted to impose additional markups on foreign currency it sold to PEI. *Id.* ¶¶ 72–73. After PEI became aware of these markups, it refused to pay them and instead continued to pay Travelex their agreed-upon rates. Moreover, after conducting an internal audit, PEI learned that Travelex had periodically assessed erroneous charges against PEI, totaling more than $ 43,000. *Id.* ¶ 78. When PEI brought these erroneous charges to Travelex's attention, however, Travelex refused to refund them. *Id.* ¶ 79. And, in June 2016, Travelex informed PEI that it had recently discovered it had "failed" to charge PEI almost $500,000 in certain costs over nine years. *Id.* ¶ 80.

5

Soon thereafter, the parties met to try and resolve their disputes and enter into a new operating agreement. *Id.* ¶¶ 85–88. However, this meeting proved fruitless, and eventually Travelex ceased all efforts to negotiate a new agreement with PEI—an agreement PEI believed should have been finalized in 2014. *Id.* ¶ 89.

Negotiations didn't resume until March 2017, when the parties met again to try and finally resolve the issues between them. *Id.* ¶ 91. During the meeting, Travelex conceded that the monies in the Frost Account belonged to PEI and promised that it would draft a revised operating agreement that reflected as much. *Id.* ¶¶ 91–92. A revised draft agreement never materialized, however. *Id.*

On March 31, 2017, PEI wrote to Travelex and expressed its frustration with Travelex's failure to resolve the pending contract issues. In particular, PEI wrote that a new agreement between the parties "should have been signed in October 2014 when Travelex entered into a new lease agreement with DFW. Since then, the [PEI] team has spent thousands of hours and well over $150,000 in legal fees and [the parties] still DO NOT have a contract nor has the operating bank account issue been resolved." *Id.* ¶ 94.

Several months later, in letters dated January 25, 2018, and January 31, 2018, Travelex wrote to DFW Airport and represented that PEI was in default of its obligations under the DFW Agreement because, among other things, (1) PEI failed to maintain a joint bank account with Travelex and (2) PEI was withdrawing money from the Frost Account. *Id.* ¶¶ 96–98.

On February 26, 2018, Travelex sent PEI a letter that purported to terminate the DFW Agreement. That same day, Travelex—supported by DFW Airport police—removed all PEI employees from the Travelex locations in the DFW Airport and took possession of all deposits

and office equipment therein. *Id.* ¶ 102. Travelex claimed that termination of the DFW Agreement was based on several breaches of contract by PEI. *Id.* ¶ 103.

One month later, on March 28, 2018, Travelex terminated the IAH Agreement. *Id.* ¶ 108. As the basis, Travelex cited a provision in the IAH Agreement that allowed for termination if Travelex became "insecure" as to PEI's future performance under any agreement between the parties. *Id.* ¶ 109. That same day, Travelex wrested control of operations at IAH Airport from PEI, much like it did at DFW Airport. *Id.* ¶ 111.

According to PEI, Travelex defamed it after terminating their business relationship. *Id.* ¶¶ 117–123. Specifically, on March 23, 2018, Travelex CEO James Hewitt, Jr., wrote to DFW Airport and falsely claimed that PEI was engaged in criminal activity at DFW and IAH Airports, which included making "illegal claims on Texas unemployment insurance." *Id.* ¶ 118. Hewitt stated that PEI was a "bad actor" and was "earning millions on the backs of unprotected workers at DFW Airport." *Id.* ¶ 120. What's more, Hewitt stated that DFW Airport could be subjected to "significant liability" unless DFW acted against PEI. *Id.* ¶ 121.

PEI believes that these statements were designed to harm PEI's business relationship with DFW Airport, an entity with whom PEI still maintains a business relationship independent of PEI's now-extinguished relationship with Travelex.

### B. Procedural History

Travelex filed the instant action against PEI on February 26, 2018, accusing PEI of breaching the DFW Agreement and converting monies in the Frost Account. Doc. 1. Travelex amended its complaint on March 28, 2018, to include, among other things, a claim against PEI for breach of the IAH Agreement. Doc. 9. PEI answered Travelex's amended complaint on May 10, 2018. Doc. 12. In its answer, PEI denies liability and asserts against Travelex

7

counterclaims for breach of contract, fraud, and tortious interference. Moreover, PEI adds Hewitt as a third-party defendant and asserts a defamation claim against Hewitt and Travelex.

Travelex and Hewitt now move to dismiss PEI's claims for fraud, tortious interference, and defamation. They have not moved to dismiss PEI's claim for breach of contract. Below, the Court addresses each claim in turn.

## II. STANDARD OF REVIEW

Rules 8 and 12 of the Federal Rules of Civil Procedure apply equally to claims and counterclaims. *See GEOMC Co. v. Calmare Therapeutics Inc.*, No. 17-3502-cv, --- F.3d ----, 2019 WL 1119188, at *6 (2d Cir. Mar. 12, 2019) ("As to content, a . . . counterclaim, like all pleadings, must conform to the pleading requirements of *Twombly* and *Iqbal*."). Hence, in evaluating a motion to dismiss counterclaims in an answer, the Court relies on the same legal principles applicable to motions to dismiss claims in a complaint.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*,

56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citations and internal quotation marks omitted). Consequently, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all plausible and nonconclusory factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable. . . ."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

## III. DISCUSSION

### A. PEI's Counterclaim for Fraud

Travelex argues that PEI's counterclaim for fraud suffers from four defects, each independently warranting dismissal of the claim: *First*, PEI has failed to satisfy the pleading requirements contained in Rule 9(b) of the Federal Rules of Civil Procedure, which requires claimants to plead fraud claims with particularity. *Second*, PEI has failed to plead any actionable false statements. *Third*, PEI has failed to plead facts showing a strong inference of fraudulent intent. And *fourth*, PEI has failed to plead facts suggesting reasonable reliance. Doc. 28 at 11–15. The Court agrees with Travelex's first argument and thus declines to address the others.

"Under New York law, the elements of a fraud claim are 'a representation of material fact, falsity, scienter, reliance and injury.'" *Pasternack v. Lab. Corp. of Am. Holdings*, 807 F.3d 14, 22 (2d Cir. 2015) (quoting *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 898 (N.Y. 1999)).[3] When pleading a claim for fraud in federal court, claimants must adhere to Rule 9(b) of the Federal Rules of Civil Procedure, which requires claimants to "state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). The Second Circuit has explained that Rule 9(b)'s special pleading requirement "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Consequently, allegations that "fail to specify the time, place, speaker, and . . . content" of the alleged fraud "lack the particulars required by Rule 9(b)." *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) (citation and internal quotation marks omitted); *accord Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (explaining same). Nonetheless, the "adequacy of particularized allegations under Rule 9(b) is case- and context-specific." *United States ex rel. v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (alterations and internal quotation marks omitted).

Here, Travelex contends that PEI's counterclaim for fraud fails insofar as PEI does not identify (1) *who*, exactly, on Travelex's behalf promised to increase PEI's Concession Fee; (2) to *whom* at PEI the promise was made; (3) the specific *time* the promise was made; and (4) *what*, exactly, the promise entailed. Doc. 28 at 12. Travelex claims that courts routinely dismiss fraud claims based on such vague allegations and sees no reason why the instant claim should fare any

---

[3] While not stating so expressly, the parties' moving papers make clear their belief that New York law governs this dispute. Moreover, the DFW Agreement contemplates use of New York to resolve disputes. *See* Doc. 29-2 at 14 ("Choice of Law: This agreement will be governed by the internal law of the State of New York."). Accordingly, in adjudicating the instant motion, the Court relies upon New York law.

better. *Id.* at 12–13. PEI asserts that it has pleaded sufficient facts to provide Travelex "fair and reasonable notice" of the allegations supporting its fraud claim. Doc. 30 at 6–7.

The Court concludes that PEI has failed to plead its fraud claim with particularity. PEI's answer contains the following alleged misrepresentations made by Travelex:

- "Prior to Travelex submitting the Proposal, Travelex assured PEI that . . . the split of Concession Fees would be changed in PEI's favor and increased to thirty-five (35%), at a minimum, in order to meet DFW's established thirty-five percent (35%) ACDBE goal;"
- "In or around December 13, . . . Travelex prepared a Proposal that highlighted the fact that PEI, its ACDBE subcontractor, would . . . exceed the thirty-five percent (35%) minimum ACDBE requirement;" and
- "[D]uring the fall of 2014, Travelex and PEI began the process of drafting a new agreement, which PEI expected, and was assured by Travelex, would . . . increase PEI's revenue participation . . . and follow through on the representations Travelex had made to DFW and PEI."

Doc. 12 ¶¶ 39–48. None of these allegations, however, is sufficient for purposes of Rule 9(b).

Nowhere in its answer does PEI allege where the promises made by Travelex occurred; the form in which the promises were made (e.g., whether such promises were oral or written); the general contours of the promises (e.g., the period of time through which PEI was to receive 35 percent of the Concession Fees); to whom the promises were made (e.g., whether the promises were directed to PEI's CEO or other representatives); or by whom the promises were made. While it is undoubtedly true that "Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map," *Care Envtl. Corp. v. M2 Techs., Inc.*, No. CV-05-1600, 2006 WL 148913, at *7 (E.D.N.Y. Jan. 18, 2006), Travelex correctly notes that this circuit is replete with cases in which courts have dismissed fraud claims with similar levels of particularity (or, in some cases, even more) than that present here, *see, e.g.*, *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 214 (S.D.N.Y. 2009) ("[P]laintiff alleges that defendants instructed their representatives to make . . . misstatements . . . .The complaint,

11

however, fails to allege exactly who made the misstatements and to whom, when (other than throughout the Class Period), where, how frequently and in what form. While the complaint alleges the content of the statement itself and why plaintiff believes it to have been fraudulent, the circumstances in which the statement allegedly was made are not identified sufficiently to meet the stringent standards of Rule 9(b)."); *cf. Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95 Civ. 8450 (AGS), 1996 WL 732634, at *3 (S.D.N.Y. Dec. 19, 1996) (dismissing fraud claim without prejudice where plaintiffs' complaint failed to specifically identify the speaker of the misrepresentation, notwithstanding that the complaint (1) specified the content of misrepresentation, (2) specified that the misrepresentation was made by defendant's agents; and (3) specified that the misrepresentation was spoken to plaintiffs by defendant's agents during plaintiffs' visit to defendant's premises in April 1993).

Given PEI's failure to plead its counterclaim for fraud with particularity, PEI's claim is dismissed without prejudice.

### B. PEI's Counterclaim for Tortious Interference with Business Relations

"To prevail on a claim for tortious interference with business relations—also known as tortious interference with prospective economic advantage—under New York law, a plaintiff must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (citations and internal quotation marks omitted). The third element—that is, the "wrongful purpose" element—sets a "high bar": "[A] claim for tortious interference with business relations requires a plaintiff to show, as a general rule, that the defendant's conduct amounted to a crime or an independent tort." *Id.*

(internal quotation marks and alterations omitted) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004)). The only exception recognized by New York courts to this general rule is "where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs"—in other words, where a defendant acts with malice. *Id.* (internal quotation marks omitted); *accord Amaranth LLC v. J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 494 (App. Div. 1st Dep't 2009) (explaining same).

Here, PEI points to Travelex's successful "campaign to convince DFW Airport to allow it to terminate PEI's operation of the DFW locations." Doc. 12 ¶ 96. Specifically, PEI asserts that Travelex acted with a "wrongful purpose" when it (1) falsely accused PEI of engaging in actions contrary to the DFW Agreement, thereby convincing DFW Airport to allow Travelex to terminate its relationship with PEI, and (2) defamed PEI to DFW Airport representatives. *See* Doc. 30 at 12 (citing Doc. 12 ¶¶ 16, 18, 23, 96, 99, 102 145). Both theories fail.

First, PEI fails to allege interference of business relations between it and DFW Airport. PEI's now-terminated operations at DFW Airport arose from an agreement between PEI and Travelex, *not PEI and DFW Airport.* Indeed, the DFW Agreement makes this point clear:

> For the sake of clarity, all rights conferred upon Travelex by the Airport Authority, including, but not limited to, the right to operate concessions at the Airport as set forth in the . . . Agreement, and any permits associated with such rights, remain and belong solely to Travelex. This Agreement in no way purports to extend[], share[], assign[], or in any way transfer[] any such rights to [PEI].

Doc. 29-2 at 17. Therefore, Travelex's termination of its contract with PEI could not, in itself, interfere with any business relationship PEI had with DFW Airport or any other third party. And while PEI alleges that it has a longstanding business relationship with DFW Airport independent of PEI's Travelex-related operations, *see, e.g.*, Doc. 12 ¶ 117, nowhere in its pleadings does PEI allege interference or injury to that relationship. Accordingly, PEI's counterclaim for tortious

interference is dismissed without prejudice, as PEI does not allege that Travelex interfered with PEI's business relations with a third party.

Moreover, PEI's tortious interference claim is wholly duplicative of its defamation claim, independently warranting the claim's dismissal without prejudice. While some New York courts have allowed defamation to serve as a "predicate wrongful act for a tortious interference claim," *see, e.g.*, *Amaranth*, 888 N.Y.S.2d at 494, it is well settled that a claim for tortious interference is duplicative of a defamation claim where both claims "seek damages only for injury to reputation, or where the entire injury complained of by plaintiff flows from the effect on his reputation," *Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 895 (2d Cir. 2012) (summary order) (internal quotations marks and alterations omitted); *see also Goldman v. Barrett*, 733 F. App'x 568, 571 (2d Cir. 2018) (summary order) ("The tortious interference claim was . . . properly dismissed as duplicative of the defamation claim because any economic damages derive from defamatory statements."); *Wexler v. Allegion (UK) Ltd.*, No. 16 Civ. 2252 (ER), 2018 WL 1626346, at *8 (S.D.N.Y. Mar. 30, 2018) ("Wexler admits that the conduct underpinning his tortious interference claim amounted to the independent tort of defamation in addition to interfering with his prospective economic opportunities. . . . Accordingly, the Court finds that Wexler's tortious interference claim is impermissibly duplicative because it flows entirely from the effect of Defendants' actions on his reputation." (internal quotation marks and alterations omitted)).

Here, insofar as PEI's tortious interference claim is predicated on Hewitt's alleged defamatory statements, PEI's alleged injuries flow directly from such statements. Consequently, its claim for tortious interference is duplicative of its defamation claim.

### C. PEI's Claim for Defamation

PEI's claim for defamation against Travelex and Hewitt rests on the following alleged statements made by Hewitt to DFW Airport: (1) that PEI has engaged in criminal activity at DFW and IAH Airports by "making illegal claims on Texas insurance;" (2) that PEI was a "bad actor" who earned "millions on the backs of unprotected workers;" and (3) that PEI's actions could expose the Airport to "significant liability" if left uncorrected. *See* Doc. 12 ¶¶ 117–18, 120–23. PEI contends that these statements are "defamatory *per se*." The Court agrees.

"To establish a claim of defamation under New York law, a plaintiff must plead (1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) of and concerning the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) either causing special harm or constituting [defamation] *per se*; and (7) not protected by privilege." *Wexler*, 2018 WL 1626346, at *8; *accord Salvatore v. Kumar*, 845 N.Y.S.2d 384, 388 (App. Div. 2d Dep't 2007) (explaining same).

PEI alleges that Travelex and Hewitt made false statements concerning PEI to representatives of DFW Airport, either with knowledge of the statements' falsity or in reckless disregard thereof. Thus, PEI has successfully pleaded factual allegations satisfying the first five elements of defamation. However, PEI does not allege special damages. *Compare* Doc. 12 ¶ 153 ("As a result of these statements, PEI has been damaged in an amount to be proven at trial), *with Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 11 (App. Div. 1st Dep't 2015) ("Special damages consist of the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by the defamation and not from the effects of the defamation." (citation omitted)). Consequently, PEI's defamation claim survives only if PEI has pleaded "*per se* actionability" or, in other words, defamation *per se*.

"Defamation *per se* consists of any one of the following: (1) a statement charging an individual with a serious crime; (2) a statement that tends to injure another in his trade, business, or profession; (3) a statement that claims an individual has a 'loathsome disease;' or (4) a statement 'imputing unchastity to a woman.'" *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) (quoting *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992)). Relevant here, a statement that injures another in his trade, business, or profession "must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities." *Liberman*, 605 N.E.2d at 348. Put differently, "[t]he allegedly defamatory statement must be *targeted* at the specific standards of performance relevant to the plaintiff's business and must impute conduct that is 'of a kind incompatible with the proper conduct of the business, trade, profession or office itself.'" *Pure Power Boot Camp*, 813 F. Supp. 2d at 550 (emphasis added) (quoting *Liberman*, 605 N.E.2d at 348). Whether a defamatory statement constitutes defamation *per se* is context specific. As the Second Circuit has explained:

> The line between statements that are defamatory *per se* and those that require proof of special damages remains fuzzy. One useful general rule is that a writing which *tends* to disparage a person in the way of his office, profession or trade is defamatory *per se* and does not require proof of special damages. A related rule is that [w]here a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed."

*Cell v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 179–180 (2d Cir. 2000) (emphasis added) (citations and internal quotation marks omitted).

Here, Travelex and Hewitt argue that the alleged statements made by Hewitt are not defamatory *per se* because "[s]imply referring to an entity as a bad actor, and otherwise non-descript statements do not qualify for *per se* treatment." Doc. 28 at 24 (citing *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 330 (S.D.N.Y. 2010); *Aiola v. Malverne Union Free Sch. Dist.*,

No. 15 Civ. 64 (ADS), 2017 WL 3917018, at *12 (E.D.N.Y. Sept. 5, 2017)). The Court disagrees. Travelex, through Hewitt, allegedly made statements tending to disparage and impugn the basic integrity and creditworthiness of PEI as a business: Indeed, the statements specifically accused PEI of insurance fraud and other wrongful acts.[4] What's more, Hewitt mentioned that DFW Airport could be subjected to "significant liability" unless DFW acted in response to PEI's misdeeds as a "bad actor." The Court easily concludes that such statements, viewed together, are defamatory *per se*.

The cases cited by Travelex and Hewitt do not counsel a contrary result. In *Thai v. Cayre Group*, Thai, a bookkeeper, sued her former supervisor for defamation after the supervisor denied her request for swipe-card access to a side entrance door more convenient to her work area. 726 F. Supp. 2d at 326–328. In denying her request, the supervisor stated, in front of the company's president, that Thai was denied access for "security reasons." *Id.* at 327. Thai alleged that the supervisor's statement created the impression that she could not be trusted. The district court dismissed Thai's claim, reasoning that the supervisor's statement was not "of and concerning" her:

> [The supervisor] stated that Thai would not be given a swipe card for "security reasons"—this is not the equivalent of calling her a "security risk." [The supervisor]'s statement merely provided the [c]ompany's reason for maintaining a secure entrance and denying access to some employees; it does not single Thai out in any way. Considering the statement in context, a reasonable listener would not take [the supervisor]'s words as impugning Thai or her integrity personally.

---

[4] Indeed, Hewitt's alleged statements may be defamatory *per se* insofar as accusations of wage theft and insurance fraud constitute accusations of "serious crimes." *See O'Diah v. Yogo Oasis*, 954 F. Supp. 2d 261, 275 (S.D.N.Y. 2013) ("An accusation of theft constitutes an allegation of a 'serious crime.'"); *Fox v. Idea Sphere, Inc.*, No. 12 Civ. 1342 (CM), 2013 WL 1191743, at *20 (S.D.N.Y. Mar. 21, 2013) ("An accusation of larceny . . . comes within the ambit of [a serious crime]."); *DeCastro v. Kavadia*, No. 12 Civ. 1386 (AT), 2016 WL 11359165, at *11 (S.D.N.Y. Sept. 30, 2016) ("The open letter falls squarely within the first category of defamation *per se*. The letter accuses Kavadia of writing a bad check and stealing diamonds valued at millions of dollars.").

17

*Id.* at 334–35 (footnotes omitted). Here, in contrast, Hewitt's statement to DFW Airport that PEI was a "bad actor" who engaged in insurance fraud and harmed its employees plainly implicated PEI's business integrity and was "of and concerning" it.

Travelex and Hewitt's reliance on *Aiola v. Malverne Union Free School District* fares no better. There, the district court held that Aiola, former head custodian at a local high school, could not sustain a defamation claim against his former supervisor where the supervisor had remarked, with others present, that Aiola had been fired from a prior position—an assertion Aiola claimed was false. 2017 WL 3917018, at *4, *12. In so holding, the district court reasoned that "[the supervisor]'s generalized accusation that [Aiola] was terminated from a prior position—*without identifying any purported basis for the termination*—did not at all bear upon his fitness to be the [h]ead [c]ustodian." *Id.* at *12 (emphasis added). Here, in contrast, the Court faces a different scenario. PEI alleges that Hewitt referred to PEI as a bad actor and set forth specific bases for the assertion that touched upon specific standards of conduct relevant to PEI's business. On these facts, PEI has sufficiently pleaded a claim for defamation *per se*.

Travelex and Hewitt offer an additional reason why the Court should dismiss PEI's defamation claim. Specifically, Travelex and Hewitt argue that the allegedly defamatory statements are protected by the common interest privilege. Otherwise defamatory statements may be protected under this qualified privilege if they are made to persons who have some common interest in the subject matter, such as when co-workers discuss an employee's misconduct, or when parties discuss a topic concerning their business relationship. *See, e.g.*, *Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint Fire Dist.*, 178 F. Supp. 3d 118, 166 (S.D.N.Y. 2016); *accord Foster v. Churchill*, 665 N.E.2d 153 (N.Y. 1996) (finding *per se* defamatory statements to be protected under the common interest privilege).

However, the common interest privilege does not shield defendants from liability for defamatory statements made *solely* with malice. *Thai*, 726 F. Supp. 2d at 330 (S.D.N.Y. 2010). "Malice includes spite, ill will, knowledge that the statements are false or reckless disregard as to whether they are false. Spite and ill will refer to the speaker's motivation for making the allegedly defamatory comments, not to the defendant's general feelings about the plaintiff." *Broyles v. J.P. Morgan Chase & Co.*, No. 08 Civ. 3391 (WHP), 2010 WL 815123, at *5 (S.D.N.Y. Mar. 8, 2010) (alterations omitted) (quoting *Curren v. Carbonic Sys., Inc.*, 872 N.Y.S.2d 240, 242 (App. Div. 2d Dep't 2009)). Claimants cannot plead malice simply by labeling the statements so in a conclusory fashion. *Thai*, 726 F. Supp. 2d at 335 (noting that allegations based on "surmise, conjecture, and suspicion" are insufficient to defeat common interest privilege). Instead, claimants must plead "facts suggestive enough to warrant discovery." *Yukos Capital S.A.R.L. v. Feldman*, No. 15 Civ. 4964 (LAK), 2016 WL 4940200, at *8 (S.D.N.Y. Sept. 14, 2016).

Here, assuming *arguendo* Hewitt's communications with DFW Airport fall within the common interest privilege, at this juncture the Court concludes that PEI has alleged sufficient facts tending to show that Hewitt made these communications with malice. The gravamen of PEI's defamation claim is that Hewitt made the allegedly defamatory statements with, at minimum, reckless disregard as to whether those statements were false, and PEI has alleged that those statements were made to harm PEI's reputation and its positive relationship with DFW Airport, an entity that purportedly needed to approve Travelex's termination of its Agreement with PEI. Furthermore, "[t]he nature and extent of defendants' *mens rea* is a question of fact not appropriate for disposition under Rule 12(b)(6)." *Flaherty v. All Hampton Limousine, Inc.*, No. 02 Civ. 4801 (DRH), 2008 WL 2788171, at *8 (E.D.N.Y. July 16, 2008) (citing *Penn Grp., LLC*

*v. Slater*, No. 07 Civ. 729 (MHD), 2007 WL 2020099, at *6 (S.D.N.Y. June 13, 2007)). Accordingly, assuming *arguendo* the statements are privileged, PEI has pleaded sufficient facts to defeat such privilege at this juncture.

## IV. CONCLUSION

For the reasons explained above, Travelex and Hewitt's motion to dismiss PEI's counterclaims is GRANTED in part and DENIED in part. Specifically, PEI's counterclaims for fraud and tortious interference are DISMISSED without prejudice. If PEI wishes to file an amended answer to replead those counterclaims, it must move for leave to do so by April 8, 2019, and it must attach to its motion a copy of the proposed answer. Travelex and Hewitt's motion to dismiss PEI's defamation suit is DENIED. The parties shall appear for a case management conference on April 26, 2019, at 3:00 p.m. The Clerk of Court is respectfully directed to terminate the motion, Doc. 27.

It is SO ORDERED.

Dated: March 19, 2019
        New York, New York

                                                    Edgardo Ramos, U.S.D.J.