UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRAVELEX CURRENCY SERVICES, INC.,

Plaintiff,

– against –

PUENTE ENTERPRISES, INC.,

Defendant.

PUENTE ENTERPRISES, INC.,

Counterclaimant,

– against –

TRAVELEX CURRENCY SERVICES, INC.,

Counter-Defendant.

PUENTE ENTERPRISES, INC.,

Third-Party Plaintiff

– against –

JAMES C. HEWITT, JR.,

Third-Party Defendant.

**OPINION & ORDER**

18 Civ. 1736 (ER)

Ramos, D.J.:

      Travelex Currency Services is a retail foreign-currency exchange company. For years, Travelex subcontracted with Puente Enterprises, Inc. ("PEI") — an airport-concessions operator owned by its Chief Executive Officer, Gina Puente — to offer consumers Travelex products and services at various locations in the Dallas/Fort Worth International Airport ("DFW") and the George Bush Intercontinental Airport ("IAH"). Travelex and PEI's business relationship, however, deteriorated in 2016 when a dispute arose over the ownership of monies contained in a certain operating bank account. Eventually, Travelex terminated its business relationship with

PEI and brought a complaint accusing PEI of breach of contract and conversion. Am. Compl., Doc. 9.

In answering Travelex's complaint, PEI denied liability and asserted counterclaims against Travelex for breach of contract, fraud, and tortious interference. Moreover, PEI brought a third-party complaint against James C. Hewitt, Jr. — Travelex's Chief Executive Officer — asserting a claim for defamation against both Hewitt and Travelex. Answer, Doc. 12.

On March 19, 2019, PEI's counterclaims for fraud and tortious interference were dismissed without prejudice, and Travelex and Hewitt's motion to dismiss PEI's breach of contract and defamation claims was denied. Op. and Order on Defs.' Mot. to Dismiss ("Mot. to Dismiss Order"), Doc. 52. PEI now moves to amend its counterclaims for fraud and tortious interference, and assert a new counterclaim of fraudulent inducement against Travelex. For the reasons set forth below, their motion is DENIED.

## I.  BACKGROUND

Travelex and Hewitt oppose PEI's motion on grounds of futility. Mem. in Opp'n ("Travelex Opp'n") at 6, Doc. 57. "In addressing the proposed futility of an amendment, the proper inquiry is comparable to that required upon a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 604 (2d Cir. 2005) (internal quotation marks omitted). Accordingly, in deciding PEI's motion to amend its counterclaims, the Court construes PEI's answer and counterclaims in the light most favorable to PEI. *Id.* (construing the facts alleged in the light most favorable to the party seeking to amend).

### A.  Factual Background

In July 2005, Travelex successfully bid to provide currency services at DFW. Motion to Am. Ex. B ("Am. Countercl.") ¶ 33, Doc. 55. Around that same time, Travelex subcontracted

with PEI — a certified Airport Concession Disadvantaged Business Enterprise ("ACDBE")[1] — to provide currency services on Travelex's behalf at DFW. *Id.* In support of its Travelex-related operations, PEI used a bank account it had already maintained at Frost National Bank (the "Frost Account"). *Id.* ¶ 34.

In August 2008, Travelex subcontracted with PEI to operate four additional Travelex locations at DFW. *Id.* ¶ 35. In light of their expanded relationship, Travelex and PEI entered into a new operating agreement (the "DFW Agreement"), dated January 1, 2009, which governed their rights and obligations regarding their business relationship at DFW. *Id.* ¶ 37. As part of the agreement, PEI paid Travelex 70 percent of the concessions' gross revenue, referred to as a "concession fee" by the parties. Decl. of Drew Hollander ("Hollander Decl.") Ex. C ("2009 DFW Agreement"), at 28, Doc. 58. PEI was entitled to the remaining 30 percent of gross revenue. *Id.* at 6.

In February 2010, in further expansion of the parties' relationship, Travelex subcontracted with PEI to operate certain Travelex retail locations at IAH in Houston, Texas (the "IAH Agreement"). *Id.* ¶ 38.

### 1. DFW 2013 Request for Proposal

In September 2013, DFW issued a Request for Proposal ("RFP"), soliciting proposals from businesses to operate retail locations in Terminals B and D at DFW for a five-year period.

---

[1] The definition of an ACDBE is provided in 49 C.F.R. § 23.3 (2019):

Airport Concession Disadvantaged Business Enterprise (ACDBE) means a concession that is a for-profit small business concern—

(1) That is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and

(2) Whose management and daily business operations are controlled by one or more of the socially and economically disadvantaged individuals who own it.

Am. Countercl. ¶ 48. Currency exchanges services were included as part of the RFP. *Id*. In December 2013, following years of successful operations by PEI of Travelex-affiliated retail locations at the two airports, Travelex applied to renew its contracts with DFW. *Id*. ¶ 55.

The DFW concession program is subject to the federal ACDBE requirements. Am. Countercl. ¶ 51. Under federal requirements, airports must establish a goal — the "ACDBE goal" — that represents the percentage of business in a market that would be conducted by disadvantaged firms if there were a "level playing field." *Id*. ¶¶ 20, 23. This percentage of business is measured by the total gross receipts generated by an ACDBE, also known as the "ACDBE participation." 49 C.F.R. 23, 55(b).

DFW set a 35 percent ACDBE goal for successful applicants. DFW allowed a number of methods for meeting this goal, and PEI and Travelex selected the "Percentage Participation" option, which required that:

> A percentage of the business is designated to be owned, operated and/or maintained by a certified ACDBE through a sub-lease, management, operating and/or franchise agreement.

Am. Countercl. ¶ 52.

The RFP also required vendors and their subcontractors who selected this option to submit a draft of their operating agreement, a separate contract which would define the terms of their working relationship. Hollander Decl. Ex. A ("2014 Travelex DFW Proposal"), at 2–3. This agreement would outline, among other terms, the compensation structure between the vendor and its subcontractor. *Id*. at 193.

PEI alleges that it was one of only two ACDBEs in the country that could satisfy DFW's other contractual requirements. Am. Countercl. ¶ 44. According to PEI, the DFW application process was highly competitive; hence, securing PEI's cooperation was critical to the success of Travelex's application. *Id*.

## 2. *Travelex's Preparation for the RFP*

In preparation for submitting its proposal to DFW, Travelex repeatedly assured PEI and DFW that its proposal would meet the 35 percent ACDBE goal, and represented that PEI would continue to serve as Travelex's ACDBE subcontractor. *Id.* ¶ 58. Travelex representatives met with DFW and PEI employees numerous times to ensure compliance with the RFP prior to submitting the proposal. On September 12, 2013, Puente and Travelex President Jon Dario arranged a Pre-RFP meeting with DFW personnel, including Vice President of Airport Concession Zenola Campbell, Assistant Vice President of Airport Concessions Martha Hernandez, and Retail/Services Concessions Manager Carolyn Phillips. *Id.* ¶¶ 59–60. Following the meeting, DFW held a conference on October 16, 2013 for all potential RFP respondents, including Dario and Puente. *Id.* ¶¶ 62–63. After the presentation, Dario and Puente met at a Hyatt hotel at DFW for a strategy meeting. *Id.* ¶ 64. To further coordinate the terms of the proposal, Travelex representative Susan Druckman emailed DFW and PEI on November 9, 2013, noting that PEI would operate 100 percent of the business in all five Travelex locations. *Id.* ¶ 70. On November 25, 2013, Dario and Puente held a conference call, where Dario again committed to the ACDBE requirements. *Id.* ¶ 75. Following the conference call, Dario directed Travelex's Director of Marketing, PR, and Communications, Maria Brusilovsky, to finalize the draft proposal with his signature and overnight mail the document to Puente the same day. *Id.* ¶¶ 76, 81. On December 1, 2013, Brusilovsky emailed Puente a copy of the draft proposal. *Id.* ¶ 77. During every communication with PEI and DFW, Travelex acknowledged the ACDBE requirements or committed to complying with the 35 percent ACDBE goal. *Id.* ¶¶ 58–81.

Travelex did not coordinate all components of its proposal with PEI, however. Specifically, Travelex did not finalize a draft operating agreement with PEI before submitting the proposal to DFW. *Id.* ¶ 80. When Brusilovsky mailed Puente a copy of the proposal, the

document did not contain the draft operating agreement outlining the compensation structure between PEI and Travelex. *Id.* ¶ 79. In its place, Travelex only included a placeholder that said "NEED DOCUMENT PLACEHOLDER PAGE ONLY." *Id*. ¶ 80 (emphasis in original). Nonetheless, PEI signed onto the proposal without first negotiating a draft operating agreement. *Id.* ¶ 88. A few days later, however, Travelex submitted a draft operating agreement to DFW without first reviewing the terms with PEI. *Id*. ¶¶ 87–88.

### 3. Terms of Travelex's Proposal

The RFP required applicants to explain how they would meet the ACDBE goal. Within the "Description and Documentation of the ACDBE Contribution(s)," Travelex committed to the following itemization of the ACDBE proposal:

> Under the operating agreement with Travelex, Puente (the ACDBE) is projected to earn 54% of total EBITDA.
>
> - Puente is responsible for generating 100% of the gross volume.
>
> - Puente immediately retains 29.5% of revenue.
>
> - Puente is responsible for 100% of Puente operating costs.
>
> - Travelex is responsible for 100% of rent and capex.

2014 Travelex DFW Proposal at 171. Travelex further represented that the "ACDBE goal for this concession package is 35%," and that it planned to meet "a minimum of 100% of ACDBE utilization on this concessions package." *Id*. at 172. Travelex also committed to engaging PEI in "all aspects of the day-to-day operation," and that "the estimated dollar value and [ACDBE] percentage of this work is $35,997,806. 100%." *Id*. The terms regarding the ACDBE goal were signed off by both Dario and Puente. *Id*.

The draft operating agreement, although not reviewed by PEI prior to submission, also proposed compensating PEI 29.5 percent net revenue of the DFW operations in accordance with the proposed ACDBE itemization. *Id*. at 193.

### 4. *Events Following the Proposal Acceptance*

DFW accepted Travelex's proposal in February 2014. Am. Countercl. ¶ 89. Travelex and PEI still had not negotiated the separate operating agreement governing the terms of their relationship, and continued to operate under the terms of their 2009 agreement, pursuant to which PEI was paid 30 percent of the concession fees. *Id*. ¶¶ 98–99. Around the same time, DFW requested that Travelex and PEI enter into a new contract that would supersede the 2009 DFW Agreement. *Id*. In response to this request, Travelex and PEI began to negotiate a new agreement during the fall of 2014. *Id*. ¶ 99. PEI expected the terms to include a new compensation structure that Travelex allegedly promised to PEI. *Id*. ¶ 98. As part of their discussions, Travelex representative Christopher McShane emailed PEI on September 7, 2014, indicating that Travelex would be unable to increase PEI's revenue share because Travelex had already agreed to pay DFW more in rent under the belief that PEI would agree to a reduced compensation. *Id*. ¶¶ 102, 240. Puente replied later that day, stating that she had never reviewed the draft operating agreement Travelex had submitted in its proposal to DFW that included the parties' prospective compensation. *Id*. ¶ 103. Puente also objected to other suggestions during negotiations, specifically Travelex's proposal to change then-existing cash and deposit procedures that were, in PEI's view, onerous and unacceptable. *Id*. ¶¶ 104–107.

Negotiations came to a head once Travelex — for the first time — claimed ownership of the balance of monies in the Frost Account. *Id*. ¶ 109. PEI disputed Travelex's ownership, and, in response, Travelex advised PEI that it would reconcile the Frost Account and that thereafter the parties would open and use a new joint operating account going forward. *Id*. ¶¶ 110–11.

Reconciliation of the Account commenced in December 2014 and ended over fifteen months later in April 2016. *Id.* ¶ 113. On April 15, 2016, Travelex promised that, as part of any new agreement with PEI, it would release and waive all claims to monies in the Frost Account. *Id.* ¶ 120. Additionally, in an email on the same day, Travelex's Esther Galan noted that PEI had ownership over the currency in the cash register. *Id.* ¶ 121. However, Travelex inexplicably reversed positions a few days later and began claiming ownership of the balance in the Frost Account and of the cash in PEI's possession at the Travelex locations at DFW. *Id.* ¶ 123.

The rift between the parties deepened in May 2016 when Travelex attempted to impose additional markups on foreign currency it sold to PEI. *Id.* ¶¶ 127–32. After PEI became aware of these markups, it refused to pay them and instead continued to pay Travelex their agreed-upon rates. *Id.* ¶ 132. Moreover, after conducting an internal audit, PEI learned that Travelex had periodically assessed erroneous charges against PEI, totaling more than $ 43,000. *Id.* ¶ 133. When PEI brought these erroneous charges to Travelex's attention, however, Travelex refused to refund them. *Id.* ¶ 134. And, in June 2016, Travelex informed PEI that it had recently discovered it had "failed" to charge PEI almost $500,000 in certain costs over nine years. *Id.* ¶¶ 135–36.

Soon thereafter, on June 29, 2016, the parties met with representatives from DFW to try and resolve their disputes and enter into a new operating agreement. *Id.* ¶ 140. DFW required that Travelex hire a third-party auditor to reconcile the Frost Account and review the operating financials so that DFW could evaluate Travelex's compliance the ACDBE requirements. *Id.* ¶ 141. At the meeting, Travelex assured DFW and PEI that it would retain an outside auditor to both reconcile the Frost Account and review the operating financials to ensure ACDBE compliance. *Id.* ¶ 142. However, this meeting proved fruitless; Travelex never hired an auditor

and eventually ceased all efforts to negotiate a new agreement with PEI — an agreement PEI believed should have been finalized in 2014. *Id.* ¶ 144. On November 17, 2016, DFW informed Travelex and PEI that the draft operating agreement included in Travelex's RFP response was not compliant with the 35 percent ACDBE Goal. *Id.* ¶ 145.

Negotiations didn't resume until March 2017, when the parties met again to try and finally resolve the issues between them. *Id.* ¶ 146. During the meeting, Travelex conceded that the monies in the Frost Account belonged to PEI and promised that it would draft a revised operating agreement that reflected as much. *Id.* ¶ 147. A revised draft agreement never materialized, however. *Id.* On March 31, 2017, PEI wrote to Travelex and expressed its frustration with Travelex's failure to resolve the pending contract issues. *Id.* ¶ 148. In particular, PEI wrote that a new agreement between the parties "should have been signed in October 2014 when Travelex entered into a new lease agreement with DFW . . . [the parties] still DO NOT have a contract nor has the operating bank account issue been resolved." Id (emphasis in original).

After having repeatedly extended the deadline for Travelex and PEI to submit an operating agreement, DFW issued a letter on April 18, 2017 suspending PEI from participating in any solicitations issued by DFW as a result of the failed negotiations. *Id.* ¶ 152.

### 5. *Travelex's Purported Contract Termination*

Several months later, in letters dated January 25, 2018, and January 31, 2018, Travelex represented to DFW that PEI was in default of its obligations under the DFW Agreement because, among other things, PEI failed to maintain a joint bank account with Travelex and PEI was withdrawing money from the Frost Account. *Id.* ¶¶ 154–56. On February 1, 2018, however, Tamela Lee, Vice President of Business Diversity Development at DFW, informed her colleagues

at DFW that "Travelex has not provided any documentation[,] only emails requesting the termination of PEI." *Id*. ¶ 157.

On February 26, 2018, Travelex sent PEI a letter that purported to terminate the DFW Agreement on the basis of several breaches. *Id*. ¶¶ 164–65. That same day, Travelex — supported by DFW police — removed all PEI employees from the Travelex locations in DFW and took possession of all deposits and office equipment therein. *Id*. ¶ 164. Travelex then hired approximately twenty-five PEI employees to work at the DFW currency exchanges. *Id*. ¶ 173.

Following PEI's removal, Travelex attempted to subcontract with another ACDBE; however, Travelex CEO James Hewitt, Jr. emailed a new proposal to DFW on March 8, 2018 that included a 30 percent ACDBE Goal, rather than the required 35 percent. *Id*. ¶ 168; *see also* Hollander Decl. Ex. B ("2014 Travelex DFW Revised Proposal"), at 16, Doc. 58. One month later, on March 28, 2018, Travelex also terminated the IAH Agreement with PEI. *Id*. ¶ 182. As the basis for its termination, Travelex cited a provision in the IAH Agreement that allowed for termination if Travelex became "insecure" as to PEI's future performance under any agreement between the parties. *Id*. ¶ 183. That same day, Travelex wrested control of operations at IAH from PEI, much like it did at DFW. *Id*. ¶ 185.

According to PEI, Travelex defamed it after terminating their business relationship. *Id*. ¶¶ 191–123. Specifically, on March 23, 2018, Hewitt wrote to DFW and falsely claimed that PEI was engaged in criminal activity at DFW and IAH, which included making "illegal claims on Texas unemployment insurance." *Id*. ¶ 192. Hewitt stated that PEI was a "bad actor" and was "earning millions on the backs of unprotected workers at DFW Airport." *Id*. ¶ 194. Moreover, Hewitt stated that DFW could be subjected to "significant liability" unless DFW acted against PEI. *Id*. ¶ 196. PEI believes that these statements were designed to harm PEI's business

relationship with DFW, an entity with whom PEI still maintains a business relationship independent of PEI's now-extinguished relationship with Travelex. *Id*. ¶ 197. PEI alleges that as a result of Hewitt's letter on behalf of Travelex, PEI "lost one third of its business overnight," affecting its ability to timely pay rent to DFW on other locations that PEI operated independently of its relationship with Travelex. *Id*. ¶ 200. PEI claims that it was forced to enter a repayment plan to pay back rent owed to DFW for the first time in its history. *Id*. ¶ 201. PEI alleges that, under DFW policies, entities in repayment plans cannot be awarded contracts by DFW in response to RFPs. *Id*. ¶ 202.

DFW issued such an RFP on February 28, 2019 for the operation of six currency exchange locations where PEI had previously operated. *Id*. ¶ 203. In line with DFW's policies, the request for proposals disqualifies entities "in arrears on any existing contract or having default on a previous contract," and PEI was disqualified from submitting a proposal. *Id*. ¶¶ 204–05.

**B. Procedural History**

Travelex filed the instant action on February 26, 2018, accusing PEI of breaching the DFW Agreement and converting monies in the Frost Account. Travelex amended its complaint on March 28, 2018, to include, among other things, a claim against PEI for breach of the IAH Agreement. PEI answered Travelex's amended complaint on May 10, 2018. In its answer, PEI denied liability and asserted counterclaims for breach of contract, fraud, and tortious interference. Additionally, PEI added Hewitt as a third-party defendant and asserted a defamation claim against Hewitt and Travelex. On August 6, 2018, Travelex and Hewitt moved to dismiss PEI's claims for fraud, tortious interference, and defamation. Mem. in Supp. of Mot. to Dismiss, Doc. 28. They did not move to dismiss PEI's claim for breach of contract. *Id*. PEI's claims for fraud and tortious interference were dismissed without prejudice on March 19, 2019.

Mot. to Dismiss Order. PEI now moves to amend its claims for fraud and tortious interference, and to add a claim for fraudulent inducement.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a)(2) allows a party to amend its pleading with the other party's written consent or the Court's leave. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave [to amend] when justice so requires." *Id*. The "liberal spirit" of Rule 15 embodies a "strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91. (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–14. (2d Cir. 2011)). Motions to amend are ultimately within the discretion of the district court judge, who may deny leave to amend for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). The party opposing the motion to amend bears the burden of establishing that amendment would be futile, unduly prejudicial, or in bad faith. *Usov v. Lazar*, No. 13 Civ. 818 (RWS), 2014 WL 435491, at *8 (S.D.N.Y. Sept. 2, 2014).

Travelex opposes PEI's motion to amend its fraud and tortious interference with business relations claims and plead its new claim of fraudulent interference on the grounds of futility. The Court addresses each argument in turn.

## III.    FRAUD

In attempting to cure its previous claim, PEI provides the circumstances of the alleged instances of fraud, specifically the speakers, place, time, and location of the events. Travelex argues that PEI's proposed amendment still suffers from the lack of specificity that initially led the Court to dismiss its fraud claim. Specifically, Travelex argues the claim fails to allege: (1) a

false representation of fact, (2) fraudulent intent, (3) and reasonable reliance. Travelex Opp'n at 7; *see also* Mot. to Dismiss Order at 9. The Court agrees with Travelex's three arguments.

In New York, a claim of common law fraudulent misrepresentation has five elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006). Additionally, parties alleging fraud must follow the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Specifically, Rule 9(b) requires that a fraud claim must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012). Conditions of a person's mind — such as malice, intent, or knowledge — may be alleged generally. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).

### A. PEI fails to plead any material misrepresentation.

*1. PEI fails to plead that Travelex promised a 35 percent concession fee.*

PEI alleges that Travelex promised to increase PEI's concession fee from 30 percent to 35 percent upon acceptance of the DFW proposal, but never intended to do so. Am. Countercl. ¶¶ 221, 225. However, Travelex argues that PEI has not adequately pleaded that Travelex promised to increase PEI's *concession fee*, but rather has only alleged that Travelex promised to increase the *ACDBE goal* of 35 percent participation without explaining why these terms are equivalent. Am. Countercl. ¶ 221. The Court agrees with Travelex.

Under the enhanced fraud standard, plaintiffs must not only allege that the content is false, but "they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *accord Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152–53 (2d

Cir. 2013). Here, PEI alleges that Travelex falsely represented its intent to increase PEI's concession fee from 30 percent to 35 percent. Am. Countercl. ¶ 221. PEI does not specify in its pleadings which facts its allegations are based upon, only claiming that the misrepresentations include "sworn statements contained within the Proposal, emails and other communications . . . and at a Pre-RFP meeting." *Id*. ¶ 222. In PEI's Memorandum in Support for its motion, PEI clarifies that it relies upon the following events:

- "In preparation for submitting its Proposal to DFW in response to the RFP, Travelex repeatedly assured PEI and DFW that Travelex's proposal would meet the annual ACDBE goal . . . which was 35%." *Id*. ¶ 58.

- "In attendance at the September 12, 2013 meeting were DFW personnel, including Vice President of Airport Concession Zenola Campbell, Assistant Vice President of Airport Concessions Martha Hernandez and Retail/Services Concessions Manager Carolyn Phillips. At the meeting, Travelex's President Jon Dario and Ms. Puente presented to DFW personnel the merits of Travelex's and PEI's capabilities of jointly meeting the parameters of the RFP, including the annual ACDBE goal . . . which was 35%." *Id*. ¶¶ 61–62.

- "After the conference, Travelex's President Jon Dario and Ms. Puente met for a strategy meeting at a Hyatt hotel at DFW on October 16, 2013 . . . Jon Dario acknowledged that DFW made clear that DFW wanted the ACDBE participation level to be at a minimum of thirty-five percent (35%)." *Id*. ¶¶ 64–65.

- "On November 9, 2013, Travelex's representative Susan Druckman sent an email to DFW's Sonji Killyon copying Travelex's Maria Brusilovsky, in which Travelex acknowledge that the ACDBE 'goal for this concession is 35%. [Travelex's] intent is that under this agreement we will have 1 certified ACDBE operate all 5 premises and meet 100% ACDBE participation.'" *Id*. ¶ 70.

- "On November 25, 2013, Travelex's President Jon Dario directed . . . Brusilovsky to move forward with finalizing the draft Proposal, which included the promise that if awarded, Travelex would meet the thirty-five percent (35%) minimum ACDBE requirement of the RFP . . . Brusilovsky overnighted by mail the official RFP Exhibits . . . that required original signatures by Travelex's President Jon

Dario and Ms. Puente to be included in its proposal. It is these signed exhibits in Travelex's proposal that further solidifies Travelex's commitment of PEI's 35% revenue share." *Id.* ¶ 76.

- "In executing the Exhibits . . . on or about November 25, 2013, Travelex's President Jon Dario affirmed that the information regarding ACDBE participation at the 35% level 'is true and complete . . . [and] further [understood] and [agreed] that, this document shall be attached thereto and become a binding part of the concession contract.'" *Id.* ¶ 80.

- "On December 1, 2013 . . . Brusilovsky sent an email to . . . Dario, Ms. Puente and others enclosing the draft Proposal in response to the RFP . . . represent[ing] that Travelex committed to the thirty-five percent (35%) minimum ACDBE requirement and asserted that PEI was projected to earn fifty-four percent (54%) of total EBITDA." *Id.* ¶¶ 77–78.

Although PEI alleges in its pleadings that Travelex made misrepresentations about PEI's "concession fee," PEI almost exclusively rests its claim on a series of instances in which Travelex promised to increase the ACDBE goal from 30 percent to 35 percent. In one allegation, PEI identifies the promise as relating to the ACDBE revenue. Mem. in Supp. of Mot. to Amend at 9, Doc. 56.

PEI does not explain how the terms "concession fee" and "ACDBE goal" are equivalent. PEI does not define "concession fee" in its allegations, instead loosely using the terms "revenue share," "profit share," "percentage of earnings," and "gross revenue" interchangeably when describing the content of Travelex's alleged misrepresentations. *Id.* at 20; Am. Countercl. ¶¶ 76, 115, 235. Even assuming that the concession fee were understood by the parties to correspond to gross revenue — as it previously was defined in the 2009 DFW Agreement — PEI does not explain how an increase in the ACDBE goal would be understood as an increase in the allocated gross revenue. 2009 DFW Agreement at 7. According to the RFP, the ACDBE goal is "a percentage of annual gross receipts for each package;" however, the 35 percentage ACDBE goal

can be met through a number of methods. Am. Countercl. ¶ 51. PEI and Travelex selected the "Percentage Participation" option to meet this requirement, in which "a percentage of the business is designated to be owned, operated and/or maintained by a certified ACDBE through a sub-lease, management, operating and/or franchise agreement." *Id.* ¶ 52. PEI never alleges that the ACDBE goal required the ACDBE vendor to retain that same percentage of gross revenue — or concession fee — as part of their operating agreements.

PEI attempts to cure its vague equivalencies in later filings by claiming that there is a "clear link" between "Concession Fee and the ACDBE goal as percentages of revenue" that would allow the terms to be interchangeable. Mem. in Further Supp. of Mot. to Am. ("PEI Mem. in Further Supp.") at 3, Doc. 61. Further, PEI restates Travelex's alleged misrepresentations, substituting the phrases "concession fee" where "ACDBE goal" had previously been asserted. Mem. in Supp. of Mot. to Amend at 12. Yet, even its attempts to explain this so-called "clear link" are contradictory: not only does PEI substitute concession fee for ACDBE goal and gross revenue, but also EBITDA and net revenue. Mem. in Supp. of Mot. to Amend at 2; Am. Countercl. ¶ 66.

### 2. *Alternatively, PEI fails to plead Travelex never intended to fulfill its promise*

Notwithstanding PEI's false equivalency, Travelex alternatively argues that PEI's claim still insufficiently alleges a factual misrepresentation because it does not allege a statement that was false at the time it was made, rather, is based on a future promise to complete an action without demonstrating that Travelex did not intended to honor its promise when made. Additionally, Travelex argues that PEI never specifies when the alleged revenue share would commence, and that PEI concedes that a new operating agreement would first be negotiated. Travelex Opp'n at 10. PEI argues that notwithstanding Travelex's attempts at negotiating a new operating agreement, Travelex never intended to comply with its alleged misrepresentations, and

that it "strung PEI along."  Mem. in Supp. of Mot. to Amend at 21.  The Court agrees with Travelex.

An alleged misrepresentation must be "false at the time that it was made."  *In re Magnum Hunter Res. Corp. Sec. Litig.,* 26 F. Supp. 3d 278 (S.D.N.Y. 2014), aff'd, 616 F. App'x 442 (2d Cir. 2015).  Accordingly, "a failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promise at the time it is made."  *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir. 1987).  Under Rule 9(b), "intent . . . may be averred generally."  Fed. R. Civ. P. 9(b).  It must be supported, however, through factual allegations that "give rise to a strong inference of fraudulent intent."  *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).  A "strong inference" can be determined by factual allegations that constitute "strong circumstantial evidence of conscious misbehavior or recklessness" or demonstrate "both motive and opportunity to commit fraud."  *Id.* (internal quotation marks omitted).  Motive "would entail concrete benefits that could be realized by one or more of the false statements" and opportunity "would entail the means and likely prospect of achieving concrete benefits" by those methods alleged.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).  Mere non-performance of a promise is insufficient to demonstrate fraudulent intent.  *Murray*, 811 F.2d at 122.

PEI's pleadings rest on three events that demonstrate circumstantial evidence of Travelex's alleged intent to breach its promise.  First, PEI points to McShane's September 7, 2014 email, which asks PEI to accept a reduced share of revenue to offset the cost of rent.  PEI argues that this email demonstrates Travelex's intention for PEI to be "paid a reduced share of revenue regardless of the language in the proposal."  Am. Countercl. ¶ 225.  Second, PEI argues that Hewitt's email with DFW on March 8, 2018, in which Travelex attempted to impose a 30

percent ACDBE participation rate on PEI's replacement, demonstrates that Travelex ultimately did not intend to comply with the 35 percent ACDBE goal. Mem. in Supp. of Mot. to Amend at 21. Third, PEI argues that Travelex's non-performance, in which it "strung PEI along," negotiating with PEI for years while failing to provide a 35 percent concession fee, demonstrates that Travelex did not intend to meet its promise. Am. Countercl. ¶ 240.

PEI's argument fails, however, because the alleged misrepresentations — the statements of Dario, Brusilovsky, and Druckman leading up to the DFW proposal submission — occurred between October 2013 and December 2013, nearly a year before McShane's September 7, 2014 email and over four years before Hewitt's March 8, 2018 email. Accordingly, neither email demonstrates "an intent not to comply with the promise at the time it is made," but rather Travelex's frame of mind both nearly one year after and over four years following Travelex's first alleged misrepresentation, respectively. *Murray*, 811 F.2d at 121 (A plaintiff "must demonstrate that promises were made to him with a present intent not to perform the promised acts"). Additionally, Travelex's failure to enter into an agreement with a 35 percent concession fee cannot establish its purportedly fraudulent intent because non-performance alone is insufficient to demonstrate fraudulent intent. *Id.* at 122 (finding "failure to follow through on [a] promise" insufficient to demonstrate fraudulent intent).

Alternatively, PEI does allege facts that could demonstrate motive to commit fraud; however, PEI does not link these factual allegations to its pleadings. Specifically, PEI alleges that it had been "recognized by DFW for its operational excellent" and that it met DFW's RFP criteria as a certified ACDBE. Am. Countercl. ¶ 85. PEI further states upon information and belief that it was "one of only two ACDBEs in the country that could satisfy the requirements of DFW's RFP," and that the proposal process was "highly competitive and attracted companies

from around the world." Am. Countercl. ¶¶ 54, 85.[2] PEI also notes that in its November 25, 2013 call with Travelex, Travelex represented that it would "commit to the full 35% ACDBE revenue share to PEI" and that "PEI would be able to exceed 35% or earn 54% EBIDTA." *Id.* ¶ 74.

Nevertheless, PEI bases its pleadings solely on the 2014 McShane email and 2018 Dario email. *Id.* ¶ 225. Although PEI argues in its Memorandum of Further Support that Travelex misrepresented its proposed concession fee in order to induce PEI to collaborate during the RFP process, PEI Mem. in Further Supp. at 5, retroactive claims in supporting memos do not cure pleading deficiencies under Rule 9(b). *Shields*, 25 F.3d at 1128 (dismissing complaint due to failure to plead sufficient facts demonstrating strong inference of fraud under Rule 9(b)).

Given PEI's failure to establish that Travelex's statements were materially false at the time they were communicated, PEI fails the first fraud element.

### B. PEI fails to plead fraudulent intent.

Travelex argues that PEI has not pleaded any facts that demonstrate an intent to deceive PEI at the time the alleged misrepresentations were made. For the same reasons discussed above, the Court agrees.

### C. PEI fails to plead reasonable reliance.

Alternatively, Travelex argues that PEI has not sufficiently demonstrated reasonable reliance on Travelex's alleged misrepresentations. The Court agrees.

---

[2] Claimants cannot rely "upon information and belief" in pleading fraudulent intent unless the respondent uniquely is in possession of information; however, for purposes of this motion, the Court determines that PEI has provided sufficient additional facts to support its allegation. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015).

Although an assessment of the reasonableness of a party's reliance is "intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss," *Stamelman v. Fleishman-Hillard, Inc.*, No. 02 Civ. 8318, 2003 WL 21782645, at *7 (S.D.N.Y. July 31, 2003), evaluating whether a party has "adequately *pleaded* justifiable reliance can be a proper subject for a motion to dismiss." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999) (emphasis added). Claimants alleging reasonable reliance must plead that they actually relied on the alleged misrepresentations, specifically that the misrepresentation was a "substantial factor" in their decision. *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 283 (S.D.N.Y. 2019) ("Thus, Plaintiffs must plausibly allege that S & P's misrepresentation[s] or omission[s] [were] a substantial factor in inducing [them] to act the way that [they] did.") (citing *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013)).

Here, PEI states that it relied on Travelex's misrepresentations through, among other actions, continuing its business relationship with Travelex, engaging in contract negotiations with Travelex, and agreeing to act as the subcontractor in Travelex's DFW proposal. Am. Countercl. ¶ 223. Although PEI alleges it acted as a result of Travelex's statements, it does not plead any facts to demonstrate that the alleged misrepresentations were a substantial factor — or a factor at all — in choosing to act in the way that it did. PEI further alleges that it relied on the statements contained in Travelex's proposal to DFW because failure to meet the ACDBE goals "has serious ramifications not only for Travelex but for DFW." *Id.* ¶ 227. However, DFW's reliance on Travelex's alleged misrepresentations to DFW also cannot cure PEI's pleading because reliance on a misrepresentation to a third party cannot be the basis for the reliance element of fraud under New York law. *Pasternack v. Lab. Corp. of Am. Holdings*, 59 N.E.3d

485, 493 (N.Y. 2016) (stating the court "decline[s] to extend the reliance element of fraud to include a claim based on the reliance of a third party, rather than the plaintiff").

* * *

Because PEI has not sufficiently pleaded material falsity of Travelex's statements, that Travelex intended to deceive PEI, or that it reasonably relied on Travelex's alleged misrepresentations, PEI's motion to amend its fraud claim is futile.

## IV.    FRAUDULENT INDUCEMENT

PEI alleges that Travelex misrepresented its intent to provide a 35 percent concession fee upon acceptance of the DFW agreement in order to induce PEI to join its DFW proposal.  Am. Countercl. ¶¶ 235, 245.  Travelex argues that PEI's fraudulent inducement claim "is duplicative of, and fails for same the reasons that its fraud claim fails."  Travelex Opp'n at 15.  The Court agrees.

Under New York law, fraudulent inducement requires:  "(1) a material misrepresentation of a presently existing or past fact; (2) an intent to deceive; (3) reasonable reliance on the misrepresentation by appellants; and (4) resulting damages."  *Ipcon Collections, LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) (internal quotation marks omitted).  For the same reasons stated above, PEI's claim fails to demonstrate a material misrepresentation, intent to deceive, or reasonable reliance.  Accordingly, PEI's motion to amend to include a fraudulent inducement claim is futile.

## V.    TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

"To prevail on a claim for tortious interference with business relations — also known as tortious interference with prospective economic advantage — under New York law, a plaintiff must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used

21

dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."

*16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (citations and internal quotation marks omitted). The third element — that is, the "wrongful purpose" element — sets a "high bar": "[A] claim for tortious interference with business relations requires a plaintiff to show, as a general rule, that the defendant's conduct amounted to a crime or an independent tort." *Id.* (internal quotation marks and alterations omitted) (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004)). The only exception recognized by New York courts to this general rule is "where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs" — in other words, where a defendant acts with malice. *Id.* (internal quotation marks omitted); *accord Amaranth, LLC v. J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 494 (App. Div. 1st Dep't 2009) (explaining same).

Here, PEI argues Travelex "represent[ed] to PEI that it would enter into an agreement in accordance with the RFP" and that its failure to "propose an agreement on those terms" resulted in damage to its relationship with DFW. Am. Countercl. ¶ 248. Additionally, PEI argues that it had an existing relationship with its employees who worked at its currency exchange locations at DFW and that Travelex interfered with its business relationship by "encouraging those twenty-five employees to end their relationship with PEI." *Id.* ¶¶ 250–51. Both theories fail.

### A. PEI's Relationship with DFW

PEI alleges that it maintained a relationship with DFW arising from its agreement with Travelex, as well as a separate relationship based on "multiple other concession operations at DFW," independent of Travelex. *Id.* ¶¶ 152, 154.

First, PEI's now-terminated operations at DFW with Travelex cannot be the basis for its claims, as these operations arose from an agreement between PEI and Travelex, not PEI and DFW. *Id.* ¶ 200. Indeed, the DFW Agreement makes this point clear:

> For the sake of clarity, all rights conferred upon Travelex by the Airport Authority, including, but not limited to, the right to operate concessions at the Airport as set forth in the . . . Agreement, and any permits associated with such rights, remain and belong solely to Travelex. This Agreement in no way purports to extend[], share[], assign[], or in any way transfer[] any such rights to [PEI].

2009 DFW Agreement at 17. Therefore, Travelex's termination of its contract with PEI could not, in itself, directly interfere with any business relationship PEI had with DFW or any other third party.

Second, while PEI's agreements independent of Travelex would adequately comprise a relationship with DFW, PEI has not sufficiently alleged that Travelex interfered with those business relations. *16 Casa Duse, LLC*, 791 F.3d at 261. In order to meet this factor, "the defendant must interfere with the business relationship directly," through "direct[ing] some activities towards the third party" for the purpose of damaging the relationship. *Grgurev v. Licul*, 229 F. Supp. 3d 267, 294 (S.D.N.Y. 2017) (internal quotation marks omitted). The conduct must be "directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp.*, 818 N.E.2d at 1105. Yet here, PEI rests its claim of interference with its relationship with DFW by Travelex "repeatedly representing *to PEI* that it would enter into an agreement in accordance with the RFP," and through its failure to do so, PEI was suspended "from participating in any solicitations issued by DFW," including independent contracts. Am. Countercl. ¶¶ 152, 248 (emphasis added).

The only direct interference PEI provides in relation to its independent contracts are Travelex and Hewitt's alleged defamatory statements contained in a March 23, 2018 letter to DFW. *Id*. ¶¶ 191, 200. Yet, the Court previously rejected PEI's tortious interference claim "predicated on Hewitt's alleged defamatory statements" as "duplicative of its defamation claim."

Mot. to Dismiss Order at 14. Accordingly, PEI's tortious interference with business relations with DFW fails.

### B. PEI's Relationship with its Former Employees

PEI also alleges that Travelex interfered with its relationship to its former employees who worked at DFW. *Id.* ¶ 250. This relationship is also insufficient to state a claim for tortious interference.

PEI maintained a direct relationship with its former employees, as outlined in the original draft operating agreement. 2009 DFW Agreement at 8 ("Facilities employees will be the employees . . . of Puente or a Puente affiliate . . . all such staff shall be under [PEI's] sole control. However, tortious interference with business relations must be premised on "relations *existing* between the claimant and a third party." *RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 196 (S.D.N.Y. 2011) (emphasis added). Although PEI concludes that its relationship was "existing" at the time of Travelex's alleged interference, DFW had terminated PEI's operations in the location where the PEI employees had previously been contracted to work.

Yet, even assuming that its relationship with its employees was not contingent upon ongoing operations at DFW, PEI still has not sufficiently alleged that the other elements of tortious interference have been met, specifically that Travelex interfered with those business relationships. PEI claims that Travelex "intentionally and unjustifiably" interfered with its business relationships by "encouraging those twenty-five employees to end their relationship with PEI." Am. Countercl. ¶ 251. Unlike a claim for tortious interference with contract, however, which requires only that the respondent "intentionally and without justification procured a breach of a valid contract," tortious interference with business relations requires that the respondent's "conduct . . . amount[ed] to a crime or an independent tort." *16 Casa Duse, LLC*, 791 F.3d at 262 (quoting *Carvel Corp.*, 818 N.E.2d at 1105). The only exception is when

the respondent "engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Id*. (internal quotation marks omitted). If a respondent has acted "with a permissible purpose, such as normal economic self-interest, wrongful means have not been shown." *Id*. (internal quotation marks omitted).

Here, PEI has not alleged that Travelex committed a crime or an independent tort, only that it "intentionally and unjustifiably interfered" with its relationships with its former employees. Am. Countercl. ¶ 251. PEI has not alleged that Travelex acted solely for inflicting intentional harm; on the contrary, PEI alleged that Travelex hired trained employees that would have otherwise cost "thousands of dollars and weeks of time to develop and train," ostensibly in its economic self-interest. *Id*. ¶ 177.

\* \* \*

Because PEI has not sufficiently alleged tortious interference with its relationships with DFW or its former employees, its motion to amend its claim of tortious interference with business relations is futile.

## VI. CONCLUSION

For the reasons explained above, PEI's motion to amend its counterclaims is DENIED. The parties are directed to appear by telephone for a case management conference on April 24, 2020 at 3:30pm. The Clerk of Court is respectfully directed to terminate the motion, Doc. 55.

It is SO ORDERED.

Dated:   March 27, 2020
       New York, New York

_____
      Edgardo Ramos, U.S.D.J.